UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA | CRIMINAL ACTION

VERSUS

JULIAN A. ANDERSON | NO. 25-00124-BAJ-RLB

# RULING AND ORDER

Before the Court is Defendant's **Motion To Suppress Evidence (Doc. 34)**. Defendant seeks "to suppress all evidence seized from his person" during his arrest on January 14, 2025. (Doc. 35 at 6). The Government opposes Defendant's Motion. (Doc. 47). Defendant filed a Reply. (Doc. 50). The Court received testimony and heard arguments on the Motion. (Doc. 109; Doc. 113). The Parties submitted post-hearing briefing. (Doc. 117; Doc. 118). For the reasons stated herein, Defendant's Motion is **DENIED**.

## I. FACTUAL BACKGROUND

Testimony during the hearing, as well as exhibits admitted during the hearing and submitted with the Parties' briefing, establish the following facts.

### A. Tip From Confidential Informant.

On January 7, 2025, a confidential source notified Sergeant Luke Cowart, a Baton Rouge Police Department ("BRPD") narcotics detective, of alleged drug trafficking activity at an apartment located at 11634 Sherwood Valley Court, Baton Rouge, Louisiana (the "apartment"). (Doc. 112 at 34:20–22, 35:10–14). The tip

indicated that "multiple African-American males" were selling narcotics in the apartment, but did not identify the men by name or describe the men in any detail. (*Id.* at 34:20–22, 35:10–14, 57:16–18, 58:7–11).

**B. Surveillance of the Apartment.**

On January 10 and 13, 2025, as a result of the confidential tip, Cowart and assisting detectives conducted surveillance of the apartment. (Doc. 112 at 37:9–25, 39:20–25, 40:1–3). Officers observed the apartment in two ways: (1) physical observation of the apartment; and (2) electronic surveillance through a live stream transmitted by a Project NOLA camera.[1] (*Id.* at 39:20–25, 40:1–3). The Project NOLA camera was "mounted to a private residence across the street" from the apartment and in the possession of the residence's property owner. (*Id.* at 13:2–6, 13:15–17). The camera depicted activities occurring within public view. The Parties did not produce the Project NOLA video footage in this case.[2]

Cowart observed "frequent foot, bicycle, and vehicle traffic," at the apartment, with individuals arriving to and departing from the apartment after visiting for less than five minutes. (*Id.* at 40:7–12). Cowart testified that based on his nearly 13 years of experience as a narcotics investigator, he believed these frequent arrivals and

---

[1] Project NOLA describes itself as "[a] first of a kind Community-based crime camera initiative," which "provides HD crime cameras to residents, business owners, developers, associations and municipalities, which are most often placed on private property facing a street or park." *About*, PROJECT N.O.L.A. NAT'L CRIME CAMERA PROGRAM, https://www.projectnola.org/about.html (last visited Oct. 21, 2026).

[2] The Project NOLA video footage had a 30-day retention policy. Cowart testified that he was unaware of Project NOLA's retention policy and did not request the footage during that time period. (Doc. 112 at 75:09–76:11).

departures "to be indicative of narcotics distribution occurring there." (*Id.* at 34:10–19, 40:13–17).

**C. Observation of the Alleged "Hand to Hand" Transaction.**

On January 14, 2025, BRPD Corporal Zac Woodring, who assisted in the investigation, observed the apartment physically in person while Cowart observed the apartment electronically via the Project NOLA camera.

Woodring arrived outside the apartment in an unmarked vehicle at approximately 1:00 P.M. and established an unobstructed eyesight vantage on the apartment entrance. (Doc. 115 at 9:10–12, 10:2–6). Woodring testified that he observed a silver four-door Nissan arrive outside the apartment. (*Id.* at 10:9–11). "Almost simultaneously," Woodring saw a man later identified as Defendant exit the apartment wearing a green letter-style jacket and carrying a backpack. (*Id.* at 10:9–17).

Woodring testified that, from a distance of "approximately 30 yards from where the hand-to-hand transaction took place," he observed Defendant retrieve a small item from the backpack, hand it to the passenger of the Nissan, and put what appeared to be money in his pocket. (*Id.* at 10:02–11:22; 52:1–3). Woodring also observed that Defendant's "whole hand" was "engulfing" the small item. (*Id.* at 52:17–20). Woodring promptly communicated his observations to Cowart and other officers who were on their way to the location. (*Id.* at 11:23–25, 12:1–11).

Cowart, who observed the same exchange by watching live footage from the Project NOLA camera, testified that Defendant "pulled his backpack around, reached

into his backpack" and "conducted a hand-to-hand exchange with that front passenger." (Doc. 112 at 45:24–47:05; *see also* Doc. 110-1 at 2). Cowart testified that Defendant's backpack was gray, Defendant's jacket was green, and Defendant came out to the roadway "at around the same time a silver car pulled up." (Doc. 112 at 46:22–23). Cowart testified that he has "done this for a long time, and it was very, very clear that it was a suspected drug transaction." (*Id.* at 47:3–5).

A short time later, Defendant allegedly entered the front passenger seat of a black Honda Accord at the apartment. (Doc. 115 at 52:20–22). Woodring observed a second man, who the officers later identified as Benjamin Burks, enter the driver's side of the Honda, and the vehicle left the scene. (*Id.* at 10:18–25, 52:23–25). Woodring relayed the license plate number to Cowart over the BRPD radio. (*Id.* at 12:15–18; 52:25, 53:1–5).

Cowart testified that, because there were an insufficient number of officers on the scene to safely conduct a traffic stop at that time, he and his colleagues were unable to follow the Honda as they typically would when a person is suspected of drug trafficking activity. (Doc. 112 at 48:19–25). Instead, Woodring continued to physically observe the apartment for the next two hours, relaying to team members that there was no movement. (Doc. 115 at 13:05–13:11). Cowart testified that he briefed every colleague who would later be present at the traffic stop about the reasons for the BRPD's narcotics investigation at the apartment, including uniformed BRPD Officer Michael Smith, and informed the officers what their roles would be in the pursuit of Defendant. (Doc. 112 at 74:4–11, 74:24–25, 75:1).

**D. Traffic Stop and Arrest.**

Approximately two hours after the Honda left the apartment, Lieutenant Andy Kuber, a supervisory police officer in the BRPD Special Investigations Unit, advised over the radio that the Honda appeared to be returning to the apartment. (Doc. 115 at 13:12–18, 58:18–25, 59:3–11).

Smith testified that Cowart and Woodring informed him that a narcotics investigation was ongoing at the apartment. (Doc. 112 at 88:2–17). Cowart and Woodring also informed Smith that a black Honda Accord was associated with the narcotics investigation, provided Smith with the license plate of the vehicle, and directed Smith to stop the vehicle for a traffic violation if he observed one. (*Id.* at 88:20–25, 89:1–9, 102:7–25, 103:1–15).

Smith testified that, as the described Honda passed his vehicle, he observed the driver not wearing a seatbelt. (*Id.* at 91:9–24, 139:10–17; Doc. 115 at 62:20–22). Smith briefly pursued the Honda with lights and sirens activated. (Gov't Ex. 1 at 0:49–1:05). The Honda eventually came to a stop on the driveway between two buildings of the same apartment complex that had been the subject of the Project NOLA camera footage. (*See* Gov't Ex. 1 at 0:49–1:05; *see also* Doc. 112 at 51:24–25, 52:1–18). Smith testified that once he pulled out to follow the Honda, he was able to see from the driver's side window that the driver was not wearing his seat belt. (Doc. 112 at 120:23–25, 121:1–2). When Smith exited his vehicle during the traffic stop, he again observed that the driver of the Honda was not wearing a seatbelt. (*Id.*).

Smith's dashcam and bodycam footage, a photograph, and Smith's testimony establish that Smith was positioned several feet from the roadway, parallel to the roadway, and had a cell phone in his hand at the time the Honda passed him. (Doc. 112 at 119:11–25, 126:16–23; Def. Ex. 9, 11, 13). Smith testified that he "could have" been reading the cell phone just before the traffic stop, but that he was not reading it at the time the Honda passed him. (Doc. 12 at 112:22–25, 113:1–3, 127:7–10, 139:10–17). Smith testified that he saw the driver commit a traffic infraction. (Doc. 112 at 139:10–17).

On cross-examination, Kuber admitted that he made comments to another officer that "could be perceived" as criticism of where Smith positioned his vehicle while waiting for the Honda to pass his location. (Doc. 115 at 70:8–17). However, Smith insisted that his vision was not obstructed and that he clearly saw the driver not wearing a seat belt. (Doc. 112 at 139:10–17). Likewise, Kuber cannot be certain of what Smith saw or did not see because Kuber was not present with Smith when Smith observed the Honda.

Cowart characterized the driver's maneuvers before bringing the Honda to a stop as a "slow roll." (Doc. 112 at 52:2–17). He explained that a "slow roll" occurs when a driver does not "come to a complete stop," "pass[es] locations that they can easily pull over safely," yet "continue[s] to drive until they get in a position that they want to be in." (*Id.*). A video of the traffic stop reveals that the Honda continued moving forward for at least 15 seconds after the police officer activated his lights. (Gov't Ex.

1 at 0:49–1:05). The Honda passed multiple empty parking spots before turning a corner between the apartment buildings and coming to a stop. (*Id.*)

As officers approached the Honda, Defendant exited the front passenger seat. (*Id.* at 1:09). Smith directed him to walk toward the police vehicles, but Defendant instead fled on foot toward Sherwood Meadow Drive, still carrying the gray backpack that Detectives observed earlier that day. (Doc. 112 at 66:23–25, 67: 1–2, 97:6–9; Doc. 115 at 14:18–25, 15:1–7). Defendant ran in the direction of Woodring's unmarked unit on Sherwood Meadow Drive. (Doc. 115 at 14:1–21). Smith gave chase. (Doc. 112 at 97:18–20).

Woodring observed Defendant reaching for his waistband as he ran. (Doc. 115 at 15:8–15). Woodring, recognizing the same backpack and clothing from the exchange he observed earlier that day, exited his vehicle, pursued Defendant, and tackled him to the ground. (*Id.* at 14:1–25). During the ensuing struggle, Woodring testified that Defendant attempted to pull a firearm from his waistband. (*Id.* at 15:2–15). Woodring secured the weapon, later determined to be a 9mm handgun. (*Id.* at 16:1–9).

A glass jar containing approximately 62 grams of marijuana flew from Defendant's backpack. (Doc. 112 at 98:18–23; Def. Ex. 3 at 6; Doc. 115 at 16:12–18). The jar shattered when it struck the ground. (Doc. 112 at 98:18–23; Def. Ex. 3 at 6; Doc. 115 at 16:12–18). A search of the backpack revealed approximately 125 grams of marijuana, 20 dosage units of amphetamine salts, and three dosage units of alprazolam. (Def. Ex. 3 at 6).

## II. PROCEDURAL HISTORY

On August 13, 2025, the Grand Jury returned a three-count Indictment charging Defendant with the following offenses:

(1) possession with the intent to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1) (Count One);

(2) possession of a firearm in furtherance of a drug-trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A) (Count Two); and

(3) possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1) (Count Three).

(Doc. 1).

Thereafter, Defendant filed the Motion to Suppress Evidence. (Doc. 34; Doc. 36). Defendant seeks to exclude "all evidence seized from his person" during his arrest, including a firearm seized from Defendant's waistband during the arrest and "marijuana, amphetamine salts, and alprazolam" that "were allegedly found in his backpack incident to that arrest." (Doc. 35 at 6, 22). Defendant contends that "[a]ll evidence the Government seeks to introduce" from Defendant's "person flows directly from his unconstitutional arrest," including a firearm seized from Defendant's waistband during the arrest. (*Id.* at 22). (*See also* Doc. 112 at 26:13–19).

## III. LEGAL STANDARD

"The Fourth Amendment guarantees that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.'" *United States v. Hunt*, 253 F.3d 227, 230

(5th Cir. 2001) (quoting U.S. Const. amend. IV). This right "extends to vehicle stops and temporary detainment of a vehicle's occupants." *United States v. Andres*, 703 F.3d 828, 832 (5th Cir. 2013). "The essential purpose of the Fourth Amendment is to impose a standard of 'reasonableness' upon law enforcement agents and other government officials in order to prevent arbitrary invasions of the privacy and security of citizens." *Hunt*, 253 F.3d at 230. The exclusionary rule "provides that evidence obtained by an unreasonable search or seizure generally may not be used as evidence of guilt at trial." *United States v. Alvarez*, 40 F.4th 339, 345 (5th Cir. 2022) (citing *Mapp v. Ohio*, 367 U.S. 643, 655 (1961)).

"While in general, on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the material in question was seized in violation of his constitutional rights, there are several situations where the burden shifts to the government." *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993). Such situations include when a defendant shows that he was subject to a search or a seizure without a warrant. *Id.* "When the government searches or seizes a defendant without a warrant, the government bears the burden of proving, by a preponderance of the evidence, that the search or seizure was constitutional." *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).

"Probable cause for a warrantless arrest exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *United States v. Watson*, 273 F.3d 599, 602 (5th Cir. 2001)

(quoting *United States v. Wadley*, 59 F.3d 510, 512 (5th Cir. 1995)). The constitutional reasonableness of a traffic stop does not depend on the actual motivations of the officers involved, and a pretextual traffic stop does not violate the Fourth Amendment "if the officer making the stop has probable cause to believe that a traffic violation has occurred." *See United States v. Escalante*, 239 F.3d 678, 680–81 (5th Cir. 2001) (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)). The constitutionality of an officer's actions following a traffic stop is determined according to whether the officer's actions were "reasonably related in scope to the circumstances that justified the stop of the vehicle in the first place." *Andres*, 703 F.3d at 832.

Additionally, the collective knowledge doctrine provides that "reasonable suspicion can vest through the collective knowledge of the officers involved in the search and seizure operation." *United States v. Powell*, 732 F.3d 361, 369 (5th Cir. 2013). The collective knowledge doctrine applies "so long as there is 'some degree of communication' between the acting officer and the officer who has knowledge of the necessary facts." *Alvarez*, 40 F.4th at 351–52 (citing *Powell*, 732 F.3d at 369 (internal citation omitted)).

## IV. DISCUSSION

The Parties primarily contest the following issues:

(1) whether there was reasonable suspicion for the traffic stop based on a traffic violation;

(2) whether, through the collective knowledge doctrine, officers had reasonable suspicion of narcotics activity involving Defendant;

(3) whether officers' pursuit and arrest of Defendant during the traffic stop was constitutional; and

(4) whether Defendant had a reasonable expectation of privacy outside of the apartment, which was the subject of the Project NOLA camera footage.

The Court will address each issue in turn.

### A. Reasonable Suspicion for the Traffic Stop Was Based on a Traffic Violation.

Defendant's "main point of attack" is the constitutionality of the traffic stop. (Doc. 112 at 26:20–24). Defendant argues that the traffic stop was unconstitutional because Smith could not see that the driver was not wearing a seatbelt. (Doc. 118 at 1). Defendant also argues that Smith was unaware of the alleged hand-to-hand transaction or any other offenses committed by Defendant. (Doc. 35 at 13).

The Government responds that the stop "was based in part on reasonable suspicion that a traffic violation occurred," "[t]he investigation did not last longer than necessary to effectuate the purpose of the stop," and that, through "the Collective Knowledge Doctrine, officers developed reasonable suspicion that [Defendant] was engaged in criminal activity." (Doc. 47 at 3, 5, 6). The Government further argues that officers had reasonable suspicion for the investigatory stop because Defendant was involved in criminal activity. (Doc. 117 at 1).

Generally, police officers may briefly detain a person, without probable cause, if the officers have a reasonable suspicion that the person has committed, or is about to commit, a crime. *See, e.g.*, *Terry v. Ohio*, 392 U.S. 1, 22 (1968). Traffic stops, such

as the one carried out by Smith, are generally considered under this standard. *See United States v. Villafranco-Elizondo*, 897 F.3d 635, 640 (5th Cir. 2018).

Such a seizure by officers must be "justified at its inception." *United States v. McKinney*, 980 F.3d 485, 490 (5th Cir. 2020) (quoting *Hiibel v. Sixth Jud. Dist. Ct.*, 542 U.S. 177, 185 (2004)). "For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005). The Court must consider the totality of the circumstances leading up to the seizure to assess the officer's purported reasonable suspicion. *United States v. Sokolow*, 490 U.S. 1, 8 (1989); *see also United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014).

It is well-settled that pretextual traffic stops are constitutional when they are supported by probable cause that a traffic violation occurred, and an officer's subjective intent during such stops is immaterial. *Escalante*, 239 F.3d at 680–81; *Villafranco-Elizondo*, 897 F.3d at 641. The United States Court of Appeals for the Fifth Circuit has emphasized that "when the police stop a car, passengers in the car are 'seized' under the Fourth Amendment to the same extent as a driver and thus have individual standing to challenge the *stop*'s constitutionality." *United States v. Powell*, 732 F.3d 361, 375 (5th Cir. 2013) (citing *Brendlin v. California*, 551 U.S. 249 (2007)).

Here, the Court finds that Smith's traffic stop of the Honda was justified by reasonable suspicion from the outset. Smith testified that he saw that the driver of

the Honda was not wearing a seatbelt. (Doc. 112 at 91:18–24, 139:10–17). The specific and articulable fact that the driver was not wearing a seatbelt gave Smith an "objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred." *Lopez-Moreno*, 420 F.3d at 430.

Defendant contends that it would have been difficult for Smith to observe the driver not wearing a seatbelt because Smith's vehicle was several feet from the roadway, parallel to the roadway, and opposite from the driver's side. (Doc. 118 at 4; Doc. 112 at 119:11–25, 126:16–23; Def. Ex. 9, 11, 13). Defendant also points out that body-worn camera footage and Smith's testimony shows that Smith was holding his cell phone when the Honda passed. (Doc. 118 at 3; Doc. 112 at 112:22–25, 113:1–3). Defendant further relies on Kuber's criticism of the position of Smith's vehicle. (Doc. 118 at 5; Doc. 115 at 70:8–17). Even so, Smith testified that he could see without obstruction that the driver of the vehicle was not wearing a seatbelt, and the Court does not doubt Smith's credibility. (Doc. 112 at 91:9–24, 139:10–17; Doc. 115 at 62:20–22). Accordingly, the Court concludes that reasonable suspicion existed for the traffic stop based on Smith's observation.

**B. The Collective Knowledge Doctrine Provides an Additional Basis for the Stop.**

Assuming *arguendo* that Smith could not see that the driver was not wearing a seatbelt, the Court will next examine the Government's additional argument that an independent justification furnished the reasonable suspicion necessary to sustain the traffic stop. The Government argues that the traffic stop was permissible on a separate basis: the surveilling officers' collective knowledge of drug trafficking

activity. (Doc. 47 at 6–7). The Government urges that the "investigating officers had objective reasonable suspicion that illegal activity was taking place," including the tip from a "concerned citizen, direct surveillance" by Cowart of the "apartment on January 10th and 13th, and the direct observation of the hand-to-hand transaction that occurred on January 14th." (Doc. 117 at 4). As noted, the Government emphasized that all BRPD Special Investigations Division officers, including Smith, were informed of the narcotics investigation and the operational plan to conduct a traffic stop of the Honda. (*Id.*). For these reasons, the Government asks the Court to find that the traffic stop was justified.

Defendant responds that the collective knowledge doctrine does not apply because the Government failed to provide evidence proving that Smith actually knew about the alleged drug trafficking activity. (Doc. 35 at 8–9). Defendant urges the Court to require the Government to produce evidence of the officers' exact communications with one another to determine whether the collective knowledge doctrine applies. (*Id.* at 14; Doc. 118 at 7–8).

Federal district courts must carefully consider the parties' arguments about whether an "independent justification" beyond a traffic violation, such as "reasonable suspicion of drug trafficking," exists for a stop. *See United States v. James*, No. 24-30107, 2025 WL 841188, at *2 (5th Cir. Mar. 18, 2025) (citing *United States v. Zamora*, 661 F.3d 200, 208 (5th Cir. 2011)). "Even if a traffic violation has not been committed, an officer may stop a vehicle for investigatory purposes if he or she has a reasonable suspicion of criminal activity." *United States v. Spears*, 636 F. App'x 893,

898 (5th Cir. 2016) (citing *United States v. Zavala*, 541 F.3d 562, 574 (5th Cir. 2008)). "The Fourth Amendment permits brief investigative stops," such as traffic stops, "when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of a criminal activity." *Navarette v. California*, 572 U.S. 393, 396 (2014) (citing *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)).

"The reasonable suspicion analysis 'is necessarily fact-specific, and factors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion.'" *Spears*, 636 F. App'x at 898 (citing *United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999)). This "totality of the circumstances test 'allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" *United States v. Wilson*, 143 F.4th 647, 659 (5th Cir. 2025) (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

The collective knowledge doctrine provides that "an officer initiating the stop or conducting the search need not have personal knowledge of the evidence that gave rise to the reasonable suspicion or probable cause, so long as he is acting at the request of those who have the necessary information." *United States v. McPherson*, 630 F. App'x 330, 331 (5th Cir. 2016) (per curiam). The doctrine does not require that the officer "who has knowledge of the necessary facts" communicate directly with "the acting officer." *Id.* at 331–32.

Contrary to Defendant's contention, the doctrine does not demand concrete evidence of the exact communications between the officers, but simply some evidence of communication. *See id.* at 332.[3] The officers' testimony at the hearing demonstrates that the Government has met the standard articulated by the Fifth Circuit for reasonable suspicion under the collective knowledge doctrine to justify the traffic stop. The officers first received the confidential tip and then conducted physical and electronic surveillance of the apartment. The officers' surveillance revealed individuals arriving to and departing from the apartment after visiting for less than five minutes. The officers concluded, based on their training and experience, that such activity is commonly associated with drug trafficking.

Later, officers observed what they believed to be a hand-to-hand drug transaction before Defendant entered the Honda. Officers testified that they drew on their years of "experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person" and concluded that there was reasonable suspicion of narcotics distribution at the apartment to justify the stop. *Wilson*, 143 F.4th at 659.

Cowart testified that he briefed every colleague who would later be present at the traffic stop about the reasons for the BRPD's narcotics investigation at the apartment. (Doc. 112 at 74:4–11, 74:24–25, 75:1). Cowart testified that, after the

---

[3] The Fifth Circuit has emphasized that federal district courts cannot "blindly accept officers' reliance on information obtained through police channels" in determining whether the collective knowledge doctrine applies. *Alvarez*, 40 F.4th at 352. Instead, the "[G]overnment must substantiate the basis of the information." *Id.* There must also be some evidence of communication between officers about the facts giving rise to reasonable suspicion. *See McPherson*, 630 F. App'x at 332.

Honda left the apartment, he immediately described the vehicle to his colleagues, provided the license plate number, and told his colleagues to look for any potential traffic violations and to ensure that the passenger was still inside the car. (*Id.* at 49:4–11).

Woodring testified that he shared his observations of the alleged hand-to-hand transaction with Cowart and other officers who were driving to the apartment. (Doc. 115 at 11:23–25, 12:1–11). Smith testified that, before he conducted the traffic stop, Woodring and Cowart informed him that a narcotics investigation was ongoing near the apartment and that Smith and the other uniformed officers should "be in the area to assist." (Doc. 112 at 87:17–25, 88:1–25). Smith further testified that Woodring and Cowart advised him to "find a traffic violation, perform a traffic stop, treat it as normal." (*Id.* at 88:20–25, 89:1–3).

Finally, Defendant argues that the frequent visits to the apartment and Cowart's observations of the "hand-to-hand exchange" could be "consistent with innocent explanations: a popular neighbor, a small home business, or simply a residence with an active social life." (Doc. 35 at 16). However, as noted, "factors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion" to an officer trained to identify drug trafficking methods. *See Spears*, 636 F. App'x at 898 (5th Cir. 2016) (citing *Ibarra-Sanchez*, 199 F.3d at 759).

Considering the totality of the circumstances, the Court finds that the law enforcement officers' collective knowledge and observations led them to reasonably suspect that Defendant "has been, is, or is about to be engaged in criminal activity."

*Alvarez*, 40 F.4th at 350 (citing *United States v. Vickers*, 540 F.3d 356, 361 (5th Cir. 2008)). Accordingly, on this basis, the Court will not exclude the evidence seized from Defendant's person during the encounter with law enforcement officers on January 14, 2025.

### C. The Officers' Pursuit and Arrest of Defendant During the Traffic Stop Was Constitutional.

Defendant next challenges the officers' pursuit and his arrest during the traffic stop as unconstitutional. Defendant contends that the officers lacked probable cause to pursue him. Defendant asserts that Woodring's observation of Defendant reaching for his waistband "cannot retroactively justify the pursuit itself," especially because the officers' surveillance before Defendant's arrest did not reveal that Defendant participated in narcotics trafficking or possessed a weapon. (Doc. 35 at 20). Defendant further argues that the "probable cause analysis must focus on the facts known to officers at the moment the seizure began." (*Id.*)

The Government responds that Defendant "immediately alighted from the vehicle" when stopped by Smith "and fled from BRPD Patrol Officers who were conducting the stop." The Government points out that a "defendant's unprovoked flight from officers in a high crime area of heavy narcotics trafficking supported reasonable suspicion that the defendant was involved in criminal activity." (Doc. 47 at 6). The Government also argues that "prior to Defendant's flight in the instant case, investigators had already observed activity around the apartment consistent with illegal narcotics distribution," including Defendant's participation "in a hand-to-hand transaction." (*Id.*). The Government further points out that, once Woodring

made physical contact with Defendant, Defendant was "actively resisting officers and attempting to access a firearm secreted in his waistband." (*Id.*) Defendant also "dropped a glass jar containing approximately 62 grams of confirmed marijuana in plain view of the responding officers." (*Id.*).

"Under the Fourth Amendment, a warrantless arrest must be based on probable cause." *Zavala*, 541 F.3d at 575 (citing *United States v. Castro*, 166 F.3d 728, 733 (5th Cir. 1999) (en banc)). "Probable cause for a warrantless arrest exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Watson*, 273 F.3d at 602 (quoting *Wadley*, 59 F.3d at 512).

The Court concludes that the officers had probable cause to arrest Defendant for suspected narcotics distribution at the apartment. Here, Woodring testified that he tackled Defendant and placed him under arrest because of the "hand-to-hand transaction" that Woodring himself observed. (Doc. 115 at 34:6–15).[4]

Taken together, Woodring and the other BRPD officers had probable cause to believe that Defendant "had committed, or was in the process of committing," a criminal offense involving narcotics distribution. *Zavala*, 541 F.3d at 575. The

---

[4] Woodring also testified that he decided to tackle Defendant and place him under arrest because Defendant "was running from officers" and "reaching for his waistband." (Doc. 115 at 15:8–10, 34:8–15). Likewise, during the suspected hand-to-hand transaction, Woodring observed Defendant "receive money and put it in his right pants pocket." (*Id.* at 34:24–25, 35:1). Moreover, Woodring testified that, when he arrested Defendant, he recognized the green jacket that Defendant was wearing and the backpack that Defendant carried during the suspected hand-to-hand transaction. (*Id.* at 14:1–25, 15:1–6).

officers' pursuit and arrest of Defendant as he ran away from the Honda with his backpack was constitutionally permissible. The evidence obtained from the related searches of Defendant's person and Defendant's backpack will not be suppressed.[5]

## V. CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendant's **Motion To Suppress Evidence (Doc. 34)** be and is hereby **DENIED**.

Baton Rouge, Louisiana, this 3rd day of November, 2026

**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[5] Defendant's argument that law enforcement officers violated his "right to be free from uninterrupted, technologically enhanced government observation of the threshold of his home without judicial authorization" by accessing the Project NOLA camera does not persuade otherwise. (*See* Doc. 110 at 6). The Fifth Circuit has emphasized that "[s]urveillance" by pole cameras "of areas open to view of the public without any invasion of the property itself is not alone a violation" of a person's protected privacy interest under the Fourth Amendment. *United States v. Dennis*, 41 F.4th 732, 741 (5th Cir. 2022).